COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-09-087-CV

 

 

IN THE INTEREST OF E.G., A CHILD                                                       

 

 

 

 

                                              ------------

 

          FROM COUNTY
COURT AT LAW NO. 1 OF WICHITA COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

                                          I.  Introduction

In one issue, Appellant Mother appeals the
termination of her parental rights by challenging the sufficiency of the
evidence to support the trial court=s best
interest finding.  We affirm.








                              II.  Factual and Procedural History

Mother was fourteen years old when she gave birth
to E.G. in September 2006.  A year later,
Child Protective Services (ACPS@)
removed E.G. from her care and the Department of Family and Protective Services
(ADFPS@) filed
a petition to terminate her parental rights.

A jury rendered a verdict of termination in the
trial held in February 2009 before an associate judge, and Mother sought a de
novo hearing in the county court at law. 
See Tex. Fam. Code Ann. ' 201.015
(Vernon Supp. 2009).  The county court at
law took judicial notice of the entire jury trial record and, after hearing
additional evidence, issued the order terminating Mother=s
parental rights to E.G.  Like the jury in
the original trial, the county court found that Mother had constructively
abandoned E.G., that Mother had failed to comply with the provisions of a court
order that specifically established the actions necessary for her to obtain
E.G.=s return
to her, and that termination of Mother=s
parental rights to E.G. would be in E.G.=s best
interest.  See id. ' 161.001(1)(N),
(O), (2) (Vernon Supp. 2009).  This
appeal followed.

                              III.  Legal and Factual Sufficiency

In her sole issue, Mother argues that the
evidence was insufficient to show that it is in E.G.=s best
interest to terminate Mother=s
parental rights.








A.  Standards of Review

A parent=s rights
to Athe
companionship, care, custody, and management@ of his
or her children are constitutional interests Afar more
precious than any property right.@  Santosky v. Kramer, 455 U.S. 745, 758B59, 102
S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex.
2003).  AWhile
parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to
recognize the constitutional underpinnings of the parent-child relationship, it
is also essential that emotional and physical interests of the child not be
sacrificed merely to preserve that right.@  In re C.H., 89 S.W.3d 17, 26 (Tex.
2002).  In a termination case, the State
seeks not just to limit parental rights but to erase them permanentlyCto
divest the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right
to inherit.  Tex. Fam. Code Ann. '
161.206(b) (Vernon 2008); Holick v. Smith, 685 S.W.2d 18, 20 (Tex.
1985).  We strictly scrutinize
termination proceedings and strictly construe involuntary termination statutes
in favor of the parent.  Holick,
685 S.W.2d at 20B21; In re M.C.T., 250
S.W.3d 161, 167 (Tex. App.CFort
Worth 2008, no pet.).








In proceedings to terminate the parent‑child
relationship brought under section 161.001 of the family code, the petitioner
must establish one ground listed under subdivision (1) of the statute and must
also prove that termination is in the best interest of the child.  Tex. Fam. Code Ann. '
161.001; In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Termination decisions must be supported by
clear and convincing evidence.  Tex. Fam.
Code Ann. '' 161.001, 161.206(a).  Evidence is clear and convincing if it Awill
produce in the mind of the trier of fact a firm belief or conviction as to the
truth of the allegations sought to be established.@  Id. ' 101.007
(Vernon 2002).  Due process demands this
heightened standard because termination results in permanent, irrevocable
changes for the parent and child.  In
re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); see In re J.A.J., 243
S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and
modification).








With regard to the best interest finding
challenged here, when we review the evidence for legal sufficiency, we must
determine whether the evidence is such that a factfinder could reasonably form
a firm belief or conviction that the best interest ground was proven.  See In re J.P.B., 180 S.W.3d 570, 573
(Tex. 2005).  We must review all the
evidence in the light most favorable to the finding and judgment.  Id. 
This means that we must assume that the factfinder resolved any disputed
facts in favor of its finding if a reasonable factfinder could have done
so.  Id.  We must also disregard all evidence that a
reasonable factfinder could have disbelieved. 
Id.  We must consider,
however, undisputed evidence even if it is contrary to the finding.  Id. 
That is, we must consider evidence favorable to termination if a
reasonable factfinder could, and disregard contrary evidence unless a
reasonable factfinder could not.  Id.

We must therefore consider all of the evidence,
not just that which favors the verdict.  Id.
 But we cannot weigh witness
credibility issues that depend on the appearance and demeanor of the witnesses,
for that is the factfinder=s
province.  Id. at 573, 574.  And even when credibility issues appear in
the appellate record, we must defer to the factfinder=s determinations
as long as they are not unreasonable.  Id.
at 573.

In reviewing the evidence for factual
sufficiency, we must give due deference to the factfinder=s
findings and not supplant the verdict with our own.  In re H.R.M., 209 S.W.3d 105, 108
(Tex. 2006).  We must determine whether,
on the entire record, a factfinder could reasonably form a firm conviction or
belief that termination of the parent-child relationship would be in the best
interest of the child.  C.H., 89
S.W.3d at 28.  If, in light of the entire
record, the disputed evidence that a reasonable factfinder could not have
credited in favor of the finding is so significant that a factfinder could not
reasonably have formed a firm belief or conviction in the truth of its finding,
then the evidence is factually insufficient. 
H.R.M., 209 S.W.3d at 108.

 








B.  Best Interest of the Child

1.  Law

There is a strong presumption that keeping a
child with a parent is in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  However, prompt
and permanent placement of the child in a safe environment is also presumed to
be in the child=s best interest.  Tex. Fam. Code Ann. '
263.307(a) (Vernon 2002).  Among others,
the following factors should be considered in evaluating the parent=s
willingness and ability to provide the child with a safe environment:  the child=s age
and physical and mental vulnerabilities; whether there is a history of
substance abuse by the child=s family
or others w0ho have access to the child=s home;
the willingness and ability of the child=s family
to seek out, accept, and complete counseling services and to cooperate with and
facilitate an appropriate agency=s close
supervision; the willingness and ability of the child=s family
to effect positive environmental and personal changes within a reasonable
period of time; whether the child=s family
demonstrates adequate parenting skills; and whether an adequate social support
system consisting of an extended family and friends is available to the
child.  Id.' 263.307(b);
R.R., 209 S.W.3d at 116.








Other, nonexclusive factors that the trier of
fact in a termination case may use in determining the best interest of the
child include the desires of the child; the emotional and physical needs of the
child now and in the future; the emotional and physical danger to the child now
and in the future; the parental abilities of the individuals seeking custody;
the programs available to assist these individuals to promote the best interest
of the child; the plans for the child by these individuals or by the agency
seeking custody; the stability of the home or proposed placement; the acts or
omissions of the parent which may indicate that the existing parent‑child
relationship is not a proper one; and any excuse for the acts or omissions of
the parent.  Holley v. Adams, 544
S.W.2d 367, 371B72 (Tex. 1976).

These factors are not exhaustive; some listed
factors may be inapplicable to some cases; other factors not on the list may
also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed
evidence of just one factor may be sufficient in a particular case to support a
finding that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.

2. 
Analysis








Mother asserts that she is a good mother and was
doing a good job of taking care of E.G. when E.G. was removed from her, that
E.G. was never abused or neglected, that she provided E.G. with a safe
environment, and that she completed her court-ordered services and maintained
significant and meaningful contact with E.G. after the removal. 

However, Mother=s own
testimony during the jury trial and at the trial de novo contradicts some of
her assertions:  she testified at the
jury trial that before E.G.=s
removal, she would smoke marijuana and then interact with E.G. while still
feeling the effects of the marijuana, although Anot very
many@ times.
She also agreed that she visited E.G. only forty-eight times out of a possible
142 visits after E.G.=s removal, and that she had been
withdrawn from school for excessive absences.[2]  Both the visits and school attendance were
service plan requirements.[3]  At the trial de novo, Mother acknowledged
that she did not do everything that she needed to do to have E.G. returned to
her.








And although Mother was supposed to stay away
from drugs as part of her service plan, her caseworker testified that Mother
admitted that she used marijuana and that Mother tested positive for marijuana
on the drug test she took a few weeks before the jury trial.[4]  Mother admitted to this at the trial de novo,
stating that it had been over a month since the last time she had smoked Apot@ and
that it was before the jury trial. 
Furthermore, with regard to E.G.=s
condition at removal, the CPS caseworker testified that E.G. had been wearing a
dirty diaper put on backwards, had a diaper rash, was dirty, and had a bad
odor, and that Aher clothes were so small that .
. . her toes were curled up in her shoes.@

Mother argues that she and E.G. are bonded to one
another and that the jury just determined that the foster parents were better
for E.G. than Aan inconsistently employed
15-year old mother with unstable housing who is a good parent,@ but the
record does not entirely support this argument, and the county court had other
factors to consider besides whether E.G. and Mother were bonded that weighed in
favor of termination.  See Tex.
Fam. Code Ann. ' 263.307(b); R.R.,
209 S.W.3d at 116; see also Holley, 544 S.W.2d at 371B72.  Mother=s
testimony about her bond with E.G. was undisputed.








Mother was fifteen years old when E.G. was
removed, but she was almost seventeen years old at the jury trial, and she was
seventeen at the trial de novo.  It is
undisputed that she was inconsistently employed:  she testified that she quit her job of five
months at Sonic around a month before trial and that she worked for Church=s
Chicken for two months before that.  She
testified at the jury trial that she did not Ado
[anything] during the days@ other
than help her grandmother with cooking and cleaning.[5]  Mother was still unemployed at the time of
the trial de novo, although she testified that she had a job interview lined up
for the following week at a fast food restaurant.








It is also undisputed that Mother had unstable
housing:  she testified at the jury
triazl that she had lived with her legally disabled grandmother for almost five
months (in three locations), with one of her sisters for the three months before
that, and with a friend of the family at the time of E.G.=s
removal.  At the trial de novo a little
over a month later, Mother testified that she had moved again and was living
with a family friend whose last name she did not know Aright
offhand,@ but who
she had known for around three years.

The county court could have determined, based on
the jury trial record and Mother=s
subsequent testimony at the trial de novo, that termination of Mother=s
parental rights was in E.G.=s best
interest because, in addition to the testimony discussed above, Mother
testified that her plans for E.G. were A[t]o
take care of her like I [was] before y=all took
her.@[6]  She testified that she did not take E.G. for
her immunizations because,

[w]hen [my sister] took
her son to get his immunizations, the wayCthe way they done him and the way they made him
feel, he was inCI mean, he couldn=t do nothing.  He couldn=t walk because he was so sore, his body.  I wasn=t going to make my baby have them shots.[7]


 

Mother also testified that her mother had problems and was not very
supportive,[8]
that she had no contact with any father figure, and that one of her sisters
also had an open CPS case.  E.G. had been
in foster care for fifteen months by the time of the jury trial.








Additionally, Mother=s CPS
caseworker testified that appointing Mother E.G.=s sole
managing conservator would significantly impair E.G.=s
physical or emotional development based at least in part on Mother=s family=s
extensive CPS history and drug use;[9]
that E.G.=s foster parents loved E.G., had
a stable home and employment, and were interested in adopting her; and that
E.G.=s
adoption by her foster parents would be in E.G.=s best
interest.

E.G.=s
court-appointed special advocate testified that E.G. was flourishing with her
foster parents and that E.G. called them AMommy
and Daddy,@ although she also called Mother
AMom@ at
visitations.  She testified that she was
unsuccessful in contacting Mother at any of the five addresses she had for her
but was successful in meeting with her at truancy court.  She recommended termination of Mother=s
parental rights, and she testified that the foster parents were in a better
position to take care of E.G.=s
emotional and physical needs and had better parenting abilities; that if E.G.
were adopted by the foster parents, E.G. would receive tuition at a four-year
college and health care until age eighteen under the programs available to assist
adopting foster parents; and that it was not in E.G.=s best
interest to be returned to Mother.








Viewing the evidence in the light most favorable
to the finding and judgment, we conclude that the county court could have
reasonably formed a firm belief or conviction that the best interest ground was
proven such that the evidence is legally sufficient to support that
finding.  See J.P.B., 180 S.W.3d
at 573.  Furthermore, in light of the
entire record, we conclude that the county court could have reasonably formed
that same firm conviction or belief, such that the evidence is factually
sufficient to support the best interest finding.  See C.H., 89 S.W.3d at 28.  Therefore, we overrule Mother=s sole
issue.

                                          IV.  Conclusion

Having overruled Mother=s sole
issue, we affirm the county court=s
judgment.

 

PER CURIAM

PANEL: MCCOY, DAUPHINOT, and GARDNER, JJ.

DELIVERED: October 15, 2009











[1]See Tex. R. App. P. 47.4.





[2]E.G. was removed from
Mother when Mother left her with someone else so that Mother could attend
truancy court.  Mother testified that she
missed some of the visits because of her work schedule.  The CPS caseworker testified that Mother=s visitation schedule was
modified four or five times to accommodate Mother=s work schedule.





[3]Mother completed the
eight parenting classes initially required in her service plan, and she
completed a drug and alcohol assessment. 
She completed half of her required counseling.  Mother did not complete the additional eight
parenting classes that CPS set up at the recommendation of the parenting class
provider and that the court ordered, nor did she complete the activities the
court ordered that she could do in lieu of the additional classes.





[4]The CPS caseworker
testified that in discussing one of Mother=s sisters, who also had an open CPS case, Mother
stated that Aat least [Mother] only
did marijuana,@ and not the particular
drug her sister used.





[5]At the jury trial, Mother
testified that, even though she had not taken the GED exam, she planned to
start school at Vernon College to study to become a certified LVN nurse=s aide and that she would
be working there, making $10.50 an hour. 
She admitted that she did not know how much she would have to pay for
day care, that she was not yet enrolled in the nurse=s aide program, and that
she did not know what an LVN was.  Mother
had not enrolled in the program by the time of the trial de novo over a month
later.





[6]Mother stated that she did
not think that the foster parents Acan do anything different than I can do.  They=re getting paid for my baby.@





[7]Mother testified that
this concern had nothing to do with recent news about thymerosol, a
preservative in some vaccines, and its potential connection to autism.





[8]On the same day that E.G.
was removed from Mother, Mother was removed from her own mother and placed in a
teen shelter.





[9]On cross-examination, the
CPS caseworker admitted that she could not think of any emotional harm that
could come to E.G. from Mother=s failure to attend school or from her constant
housing changes.